IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LINDA GRANTHAM, et al., | : | CIVIL ACTION |
| Plaintiffs | : | |
| | : | |
| v. | : | NO. 06-5056 |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| et al., | : | |
| Defendants | : | |

M E M O R A N D U M

STENGEL, J.                                                    August  28, 2008

Linda Grantham and her husband Burman bring this suit against the United States

of America and Turner Construction Company for negligently causing personal injury to

Mrs. Grantham and for the resultant loss of consortium suffered by Mr. Grantham.[1]  The

United States has filed a motion for summary judgment to which the plaintiffs have

responded.  For the following reasons, I will grant the motion in part and deny it in part.

---

[1]  In order to maintain a suit under the Federal Tort Claims Act ("FTCA"), a claimant must present her claim to the appropriate federal agency prior to filing a civil action in federal district court.  McNeil v. United States, 508 U.S. 106, 113 (1993); 28 U.S.C. § 2675(a) (requiring claimant to present claim for money damages for injury or loss of property caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment to the appropriate federal agency before suit may be filed). The claimant must present her administrative tort claim in writing to the appropriate federal agency within two years of its accrual.  See 28 U.S.C. § 2401(b); Tucker v. United States Postal Serv., 676 F.2d 954, 956 (3d Cir. 1982).  Presentment of an administrative tort claim to the appropriate federal agency is a jurisdictional requirement which cannot be waived.  McNeil, 508 U.S. at 106, 111; Roma v. United States, 344 F.3d 352, 363 (3d Cir. 2003).  It is undisputed that Mrs. Grantham exhausted her administrative remedies by filing the required claim with the Department of the Interior.  See Def. Exh. C-5.  Mr. Grantham concedes, however, that he did not exhaust his administrative remedies on his claim for loss of consortium.  Accordingly, I will grant summary judgment on behalf of the United States on this count.

I. <u>BACKGROUND</u>

_____The plaintiffs and their son and daughter-in-law, all residents of the

Commonwealth of Virginia, came to Philadelphia for the 2004 Army Navy football game.

During the afternoon of December 3, 2004, they were sightseeing in the historic district of

Philadelphia.  Grantham Dep. at 47-48.  Upon exiting Independence Hall after a free tour

of the building, the family was directed by a guard to a path adjacent to a construction site

with a metal fence running along the side of the path.  <u>Id.</u> at 64-66.  Before entering

Independence Hall, Mrs. Grantham noticed this fence, <u>id.</u> at 82, and that it kept people

from going into the dirt construction area, <u>id.</u> at 69.  Mrs. Grantham testified that the large

number of other tourists moving down the path compelled her to walk towards the left-

hand side of it, next to the metal fence.  <u>Id.</u> at 71.  Mrs. Grantham admits that although

she did not lose her balance and was not pushed, she reached up and put her hand on the

metal fence.  She did not put any weight on the fence, and did not lean on it.  <u>Id.</u> at 81, 83,

85.  Mrs. Grantham testified that when the fence began to move and topple over, she

reflexively hung onto it even though she knew it was falling.  <u>Id.</u> at 85, 86-88.  She fell

with the fence into an excavated area about eighteen inches deep, and struck her right

knee on part of the metal fence.  Mr. Grantham and a couple of other men jumped in and

helped Mrs. Grantham out of the ditch.  <u>Id.</u> at 101-103.  The Granthams waited on the

steps of the nearby Old City Hall until Park Ranger Timothy Tracy arrived and took a

statement from them about the accident.  <u>Id.</u> at 113; <u>see also</u> Tracy Dep. at 26.  Mrs.

2

Grantham refused Ranger Tracy's offer of medical assistance. Grantham Dep. at 115; see also Tracy Dep. at 53. When the Granthams returned to the hotel, Mrs. Grantham checked her knee, and discovered that it had been deeply "cut to the bone." Grantham Dep. at 115. She immediately sought treatment at nearby Hahnemann University Hospital which included stitches, a full leg cast, and crutches which she used for about a week. Id. at 122-125. Mrs. Grantham continued treatment with a local physician near her home in Virginia. Over the next several months, her knee continued to cause Mrs. Grantham difficulty. She then sought treatment with Dr. Kenneth Gray, an orthopedist. Id. at 136. Upon evaluation, Dr. Gray determined that Mrs. Grantham had a possible meniscus tear on the right knee resulting from the fall, and recommended arthroscopic surgery. Mrs. Grantham underwent the surgery and has continued treatment with Dr. Gray, including cortisone injections when necessary. Id. at 142-143. Mrs. Grantham testified that she has been advised that she will ultimately need knee replacement surgery. Id. at 145.

## II. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might

affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e). That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. at 322.  Under Rule 56, the court must view the evidence presented on the motion in the light most favorable to the opposing party.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.  The court must decide not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  Id. at 252.  If the non-moving party has exceeded the mere scintilla of evidence threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the

4

opponent, even if the quantity of the movant's evidence far outweighs that of its

opponent.  Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363

(3d Cir. 1992).

## III.  **DISCUSSION**

In Count I of the complaint, the plaintiffs contend that Mrs. Grantham suffered

serious injuries as a result of the acts and omissions of the federal government.

Specifically, the plaintiffs allege that the government, as possessor of the site, owed them

a duty of care, including a duty to maintain the premises in a safe condition such that it

would not be unreasonably dangerous to visitors such as the plaintiffs.  The government

breached that duty according to the plaintiffs by: (1) erecting and/or permitting the

erection of a fence that was not properly anchored; (2) failing to provide an anchored and

safe barrier along the path; (3) failing to warn visitors that the fence was not anchored and

was dangerous to touch; (4) failing to install and secure the fence properly and to insure

that the fence was properly installed and secured; (5) failing to supervise properly and

adequately contractors, employees, or agents who were working in the area of the

accident; (6) directing visitors onto a path that was crowded and hazardous, and failing to

direct visitors to walk in areas that would not present hazardous conditions; (7) failing to

control the crowd at the site of the accident properly and adequately; (8) allowing visitors

to come in contact with an unsafe and unanchored fence; (9) creating and/or allowing

dangerous conditions to exist at the site of the accident; and (10) failing to provide proper

security and safeguards at the site of the accident to protect visitors.

      **A.  Federal Tort Claims Act**

Defendant United States of America, as a sovereign, is immune from suit unless it consents to be sued.  United States v. Mitchell, 445 U.S. 535, 538 (1980) (citing United States v. Sherwood, 312 U.S. 584, 586 (1941)).  Under the FTCA, the United States has waived its sovereign immunity for:

> claims . . . for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1); see also 28 U.S.C. § 2674.

Congress has, however, qualified that waiver of immunity with several exceptions. Any limitations and conditions upon which the government consents to be sued must be strictly observed and exceptions thereto are not to be implied.  Lehman v. Nakshian, 453 U.S. 156, 161 (1981) (quoting Soriano v. United States, 352 U.S. 270, 276 (1957)).  In this case, the government contends that the independent contractor exception applies. Title 28 of the United States Code, Section 2671 explains that the terms "federal agency" and "employee of the government" do not include any contractor with the United States. If any injury is caused by the negligence of an independent contractor and not that of the United States, the FTCA's independent contractor exception applies, and the claim will

be dismissed for want of subject matter jurisdiction.

The critical factor used to distinguish a federal agency employee from an independent contractor is whether the government has the power "to control the detailed physical performance of the contractor." United States v. Orleans, 425 U.S. 807, 814 (1976) (citing Logue v. United States, 412 U.S. 521, 528 (1973)).  The question here is not whether the contractor receives federal money and must comply with federal standards and regulations, but whether its day-to-day operations are supervised by the federal government.  Id. at 815.  Moreover, the fact that the United States can exercise "broad, supervisory control, or even the potential to exercise detailed control, cannot convert a contractor into an agent, nor can it be the basis for imposing vicarious liability on the United States." Gibson v. United States, 567 F.2d 1237, 1242 (3d Cir. 1977).  Here, a careful review of the record reflects that Turner was an independent contractor which was given broad responsibility for the work at the construction site in question including accident prevention and safety.  Under the FTCA, the United States cannot be held liable for the negligence of Turner or Turner's employees.

Nevertheless, the plaintiffs have alleged negligent acts and/or omissions on the part of the employees of both Turner and the United States.  The FTCA does not shield the government from liability for the negligence of its own employees.  Further, the record reflects that there are genuine issues of material fact for a jury to decide whether the acts and/or omissions of the employees of the United States were negligent.

7

Independence Hall is located in an area which is part of the Independence National Historical Park ("Park"), a unit of the National Park System owned by the United States and administered by the National Park Service ("NPS").  Construction was ongoing outside of Independence Hall to replace the brick walkway in front of the building.  Compl. ¶ 8.  Along that walkway, barricades had been placed to prevent visitors from wandering into a construction area adjacent to the walkway and in front of the north side of Independence Hall.  NPS contracted with co-defendant Turner Construction Company to perform the construction.  Id. ¶¶ 10-11; Matthews Dep. at 12-21, 20-25; Edens Dep. at 19-20, 42.

Susan Edens, a cultural landscape architect for NPS, testified at her deposition that during the construction in question in the fall of 2004, she was the "point person" for the project.  Her duties included daily telephone or e-mail contact with Kenneth Matthews, the on-site superintendent for Turner during the project.  Edens Dep. at 10.  Miss Edens testified that Turner's responsibilities under the contract included: (1) accomplishing the work and completing the project in a satisfactory manner; (2) all safety issues during the project; (3) communicating with Miss Edens about her concerns during the project; and (4) all responsibilities of the general contractor for the project.  Id. at 19-21.  There were many times during the project that Miss Edens contacted Dawn Harrington, the "safety person" for NPS, to discuss various issues.  Id. at 18, 26.  For example, they discussed whether the barricades between the construction site and the pathway were too close to

8

the pathway, and whether Turner's request to use "bicycle barricades" around the concrete rather than chain link fencing should be granted.  Id. at 26-27.  During the project, Miss Edens periodically inspected the concrete and stone work as it progressed. Id. at 31-33.  From time to time, Miss Harrington accompanied Miss Edens during these inspections to be on the lookout for anything that would impact the visitors.  Id. at 35-36. Miss Edens also took digital pictures of the project periodically.  After Mrs. Grantham's accident, Miss Edens downloaded the pictures onto her computer and sent them to Don Reed, an investigator for NPS's Resource and Visitor Protection Department.  Id. at 38-39, 65-66.  Miss Edens was not aware of any other accidents involving the barricades during the project.  Id. at 50.  She never observed any of the barricades having fallen over, and was never made known of such an incident.  Id. at. 54-55.

Counsel showed Miss Edens during her deposition various provisions of the contract between the government and Turner.  She testified that she did not know whose responsibility at NPS it was to insure compliance with the obligations under the contract regarding accident prevention.  Id. at 43.  Nevertheless, she knew that all incidents were to be reported to Turner through her.  Id. at 52.  Over the course of the project, however, whoever first noticed a particular incident would often directly report the incident to Turner rather than going through Miss Edens.  Id.

After Mrs. Grantham's accident, Miss Edens spoke with Mr. Matthews and asked him to ascertain that the barricades were "okay" and to try to complete the project so that

any further accidents would be avoided.  Id. at 29.  The visiting public was no longer permitted to walk on that path after this incident.  Tracy Dep. at 42-43.

Ranger Tracy testified at his deposition that his duties as a park ranger are to protect and serve the public and the National Park, and that he is currently assigned to perform those duties at the Independence National Historical Park and the parks associated with it.  Tracy Dep. at 8-9.  Specifically, one of his duties at the Park is to remedy what he considers to be hazardous conditions or to report the situation to the authorities if he cannot remedy the situation himself.  Id. at 10, 12.

On September 12, 2001, the day after the terrorist attacks on our nation, NPS began to use barricades for security reasons in the Park.  Id. at 18.  These barricades were installed by maintenance workers of NPS.  Id. at 22.  During the construction project in 2004, barricades were added to prevent the visiting public from entering the construction site.  Ranger Tracy testified that construction workers at the project were primarily the ones who moved and adjusted the barricades because they used them for entering and exiting the construction site, and for bringing their equipment in and out of the site.  Id. at 14.  Because the barricades for both purposes were identical, Ranger Tracy could not recall at his deposition who installed the fence involved in Mrs. Grantham's accident.  Counsel showed Ranger Tracy a copy of his typewritten report of the incident which reads, "When the fence fell, Mrs. Grantham landed on top of the fence.  The fence had not been properly secured by the construction workers who put it in, thus why the fence

10

fell over." Id. at 36.  Because the ranger had written the report on the day of the accident,

he conceded that he must have known then that it was the construction workers who

installed that barricade, and not the NPS maintenance workers.[2] Id.

Ranger Tracy expounded on his reported opinion that the fence had not been

properly secured.  He indicated that "as long as the fence is put up properly with sure

footing, they [sic] don't fall over when people balance themselves on them." Id. at 37.

According to Ranger Tracy, the NPS installs the security fencing differently than the

construction workers installed the construction barricade.  NPS connects the pieces of

fence together with the two hooks on one side and two loops on the other side of the piece

so that it becomes one piece or one long chain of fencing.  Id.  The piece of fencing

involved in Mrs. Grantham's accident was a single piece and was not connected to any of

the other pieces.  Id. at 37-38.

Ranger Tracy first became aware that this particular piece of fence was not

properly secured after Mrs. Grantham fell.  Id.  During the project, the construction fence

line was constantly being moved because construction workers had to bring equipment in

and out of the site.  Id. at 39.  Whenever he saw the fence line poorly placed, Ranger

Tracy repositioned it himself as part of his duty of checking for hazardous conditions.  Id.

If he had known about a piece of unsecured fencing, he would have moved it.  Id.  When

---

[2] I also note that earlier in his incident report, Ranger Tracy wrote, "The contracted employees, to prevent visitors from entering the construction area, had placed the fence there." See Def. Exh. C-4.

shown three photographs of barricades at the construction site, Ranger Tracy could tell which fences were not properly secured.  Id. at 40.  Some of the fences were not interlocked or linked together.  Id.

Ranger Tracy was not aware of any other accidents involving the barricades.  Id. at 49.  There were incidents, however, where fencing draped with bunting or flagging had been blown over by extremely heavy winds.  Id. at 49-50.  This never occurred with the construction barricades because they would never have been covered with bunting.  Id. at 50.

Ranger Tracy also testified that from time to time he observed the "feet" of one of the barricades hanging over the edge.  Id. at 53-54.  Because he considered that to be an unstable condition, Ranger Tracy moved the fence line back to ensure that the fence line was on sure footing.  Id. at 54.

Kenneth Matthews testified at his deposition that he was the on-site superintendent for Turner who worked on the Independence Mall project at the time of Mrs. Grantham's accident.  Matthews Dep. at 10, 23.  He testified that his duties during this project included being in charge of running all the construction operations, managing the engineering of the job, responding to questions posed by subcontractors, dealing with the architects and engineers, and monitoring the subcontractors' quality control.  Id. at 12-14.  Another part of his job was to insure that the contractors were working safely by enforcing safety rules.  Id. at 23.  With respect to safety involving the use of barricades,

12

Turner's obligation was "to make sure that [the fencing] is secure, that it's not unsafe that it could fall over or that type of thing." Id. at 24.  The subcontractors involved in the project had the exact same obligation, that is, to maintain the fence, to make sure that it is standing properly, and to move it as needed for the different phases of the project. Id. at 24-25.  Matthews also testified that the barricades at the construction site belonged to the NPS, and had been used earlier by NPS for purposes of security. Id. at 25.  The NPS granted Turner's request to borrow the barricades for use at that particular site because they were less cumbersome than the chain link fences used at the earlier stages of the project. Id. at 25-26.  Matthews said that the decision of where to place the fencing was a combined one between Matthews and the NPS. Id. at 28.  The possible positions for the fence were extremely limited, so the workmen established the fencing line around the edge of the concrete. Id.  Matthews testified that it was his recollection that he and NPS discussed placing the barricades close to the construction, i.e., right up to the edge of the path, to give as much room on the path for the public as possible. Id. at 32.

Matthews also testified that JPC, a subcontractor on the project, had the responsibility of moving, replacing, and securing the barricades. Id. at 31.  If Matthews saw anything improper about the barricades, he would tell the subcontractor to correct it. Id.  Matthews recalls noticing portions of the fence that were not interlocked a "few times a week." Id. at 32-33.  When Matthews did notice that situation, he went directly to the JPC foreman to tell him to fix the fence. Id. at 33.  Matthews stressed that he would only

13

report unsafe conditions with the fence, that is, if he felt there was a danger of the fence

falling over.  Id. at 37-38.  In fact, Matthews would not report seeing portions of the fence

not interlocked or hanging too close to the edge unless he felt that the fence was in danger

of falling over.  Id. at 37-38, 39.  He opined that "the fence interlocking doesn't have to

do with safety."  Id. at 39.  Matthews also said that the fence may not have been

interlocked at various times or at various places where the workmen needed to gain

access to the site or to bring in tools or equipment.  Id. at 45.  Generally, however, the

workers would try to keep the fence interlocked in areas not needed for access.  Id.  It was

Matthews' responsibility to address situations of unsecured fencing with the workers and

subcontractors.  Id. at 45-46.

The FTCA requires the court to consider whether, under the circumstances of a

plaintiff's injury, the United States, if a private person, would be liable under

Pennsylvania law.  28 U.S.C. § 1346(b); Gales v. United States, 617 F. Supp. 42 (W.D.

Pa. 1985).  Under Pennsylvania law, a landowner is not an insurer of the safety of persons

on the premises.  See Martino v. Great Atlantic & Pacific Tea Co., 213 A.2d 608, 610

(1965).  To impose liability on a landowner, however, a plaintiff must show that the

landowner breached a duty of reasonable care under the circumstances.  Id.  A

landowner's duty of care toward a third party entering the land depends upon whether the

entrant is a trespasser, licensee, or invitee.  Cresswell v. End, 831 A.2d 673, 675 (Pa.

Super. Ct. 2003).

14

The government insists that Mrs. Grantham was a licensee[3] on its property.  It contends that Mrs. Grantham came onto the NPS property for her own purposes rather than for any interest of the Park.  Palange v. City of Philadelphia, et. al., 640 A.2d 1305 (Pa. Super Ct. 1994).  To insinuate that NPS has no interest in sharing the riches of our nation's heritage with the public, and that it allows the public entrance as a mere personal favor is insulting to NPS, to Mrs. Grantham, and to every tourist, young and old, who makes the trip to our historic area.

Instead, I find that at the time of this accident, Mrs. Grantham was a public invitee on NPS's property.  Pennsylvania law defines the term "invitee" as follows:  (1) An invitee is either a public invitee or a business visitor;  (2) A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public;  (3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of land.  Gutteridge v. A.P. Green Servs, 804 A.2d 643, 655-56 (Pa.Super. 2003).  The duty of care owed to an invitee is "the highest duty owed to any entrant upon land," id. at 656, and requires landowners to protect invitees from both known and foreseeable harms.  Restatement (Second) of Torts §§ 341A, 343, 343A.  Mrs. Grantham was but one of thousands of tourists who come from all corners of the world to

---

[3]  Section 330 of the Restatement (Second) of Torts provides that a licensee is "one whose presence upon the land is solely for her own purposes, in which the possessor has no interest, and to whom the privilege of entering is extended as a mere personal favor to the individual, whether by express or tacit consent or as a matter of general or local custom."

experience the birthplace of our nation.  The NPS offers tours on a constant basis of various points of interest in the area to citizens and non-citizens alike.  That is the purpose for which the Park is held open to the public.  The Restatement (Second) of Torts sets forth the duty of care as follows:  A possessor of land is subject to liability for physical harm caused to its invitees by a condition on the land if, but only if, it (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and (b) should expect that the invitees will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger. Restatement (Second) of Torts 343.  Here, there are sufficient issues of material fact to present to a jury to determine whether the acts and/or omissions of the government's employees amounted to a breach of the government's duty of care as the possessor of the land on which Mrs. Grantham fell.

For example, the government argues that Mrs. Grantham's noticing the barricades and their purpose prior to entering Independence Hall relieves it of liability.  See Section 342 of the Restatement (Second) of Torts.[4]  It contends that the condition was an open

---

[4]  This section of the Restatement provides for the duty of care owed to *licensees* as follows:  A possessor of land is subject to liability for physical harm caused to licensees by a condition on the land if, but only if, (a) the possessor knows or has reason to know of the condition and should realize that it involves an unreasonable risk of harm to such licensees, and should expect that they will not discover or realize the danger, and (b) it fails to exercise reasonable care to make the condition safe, or to warn the licensees of the condition and the risk involved, and (c) the licensees do not know or have reason to know of the condition and the risk
(continued...)

and obvious one, so that any danger it might have posed was readily apparent to the plaintiff.  A fair reading of Mrs. Grantham's testimony is inapposite to the government's contention.  Mrs. Grantham did not testify that she was aware that the barricades were unstable and posed a potential risk of toppling over.  Instead, she testified that she noticed the existence of the barricades and was aware that they kept people from entering the construction site.

Further, the decision to place the barricades right on the edge of the sidewalk was a joint decision between both defendants.  Sandbags were routinely used to stabilize fencing in other areas of the Park, but were not used on the barricades in the area where Mrs. Grantham fell.  Matthews Dep. at 26.  Miss Edens and Ranger Tracy both acknowledged that they had been aware that at certain times there had been pieces of fencing that were not interlocked to other portions of the barricades.  Miss Edens and her safety advisor had discussed whether the barricades between the construction site and the pathway were too close to the pathway.  Miss Edens also recalled that some of the barricades were used for access into the construction site, and thus were not interlocked.  Ranger Tracy was able to point out the barricades in a picture which were not properly secured.  He also testified that the fence line was constantly being moved, that he had

---

[4](...continued)
involved.  Restatement (Second) of Torts § 342 (emphasis added).  As shown above, there is a parallel subsection in the Restatement pertaining to invitees providing that the landowner is subject to liability if it can be expected that the invitee would not discover or realize the danger, or would fail to protect themselves against it.  Restatement (Second) of Torts § 343(b).

observed the fence line being poorly placed at times, and that he had repositioned the fence line himself.  He even observed from time to time the feet of one of the barricades hanging over the edge.  Id. at 53-54.  Because he considered that to be an unstable condition, Ranger Tracy moved the fence line back to ensure that the fence line was on sure footing.  Id. at 54.  He explained that his remedying hazardous conditions was part of his duties as a ranger.

Miss Edens also testified that it was the duty of the Division Chief of Interpretation Department of NPS to decide how to route visitors entering and leaving the various exhibits in the Park.  Edens Dep. at 40-41.  An NPS employee guided the Granthams' tour group down the stairs and directed them to walk down a narrow brick path adjacent to the construction site.  After Mrs. Grantham's accident, the public was re-routed and not permitted on that path.

This evidence indicates that NPS employees were aware of the potentially dangerous condition associated with the barricades, and even repositioned the barricades to safer locations from time to time.  Despite this knowledge, NPS routed the tourists down the narrow path where the barricades were located.  The government never warned the plaintiff that the barricades could be unstable or that they could topple off the edge of the path, even though it knew of that potential.  What impact this testimonial evidence would have on determining the liability of the government rests with the jury.

The plaintiffs further argue that this pathway was too narrow to accommodate

large crowds without forcing some visitors up against the barricades in a way that would likely cause the barricades to topple off the edge of the pathway.  In fact, the plaintiff submitted a report written by Alan E. Meade, P.E., a civil engineer who provides expert technical services in the areas of civil engineering, construction-related injuries, industrial accidents, and engineering professional liability.[5]  Mr. Meade opined that:

- If the movement of the visitors into and along the brick walkway had been properly controlled to avoid crowding, it is likely that Mrs. Grantham would not have put her hand on the fence and her incident would not have occurred.

- If NPS had utilized a different route, the visitors would not have been exposed to the unstable fence.

- NPS's failure to adequately inspect the work, particularly the open and obvious fencing along the brick walkway, was a cause of Mrs. Grantham's fall and the resulting injuries.

- NPS's failure to avoid crowding of visitors on the brick walkway next to the sidewalk construction was a cause of the incident.

See Pl. Exh. H.

The plaintiff submitted this uncontradicted evidence in response to the government's assertion that there exists no genuine issues for trial.  Even when viewing it in the light most favorable to the opposing party, see Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, I find that a reasonable and fair-minded jury could return a verdict for the plaintiff after considering this expert's report.  Id. at 252.  Accordingly, summary judgment is not appropriate here.

---

[5] See Curriculum Vitae at http://www.robsonforensic.com/CV/MeadeAlan_ph_wm.pdf.

**B.  Recreational Use of Land and Water Act**

The United States also argues that it is immune from suit pursuant to

Pennsylvania's Recreational Use of Land and Water Act (the "Act"), and that it is entitled

to judgment as a matter of law as such immunity applies preventing the plaintiff from

recovering damages for her injuries.  The Act protects landowners from liability by

expressly negating ordinary common law duties to keep the land safe or to warn of

dangerous conditions.  Murtha v. Joyce, et al., 875 A.2d 1154, 1156 (Pa. Super. Ct. 2005).

The purpose of the Act "is to encourage owners of land to make land and water areas

available to the public for recreational purposes by limiting their liability toward persons

entering thereon for such purposes."  68 P.S. § 477-1.  It broadly describes its protection

as follows:

> Except as specifically recognized or provided in Section 6 of
> this Act,[6] an owner of land[7] owes no duty of care to keep the
> premises safe for entry or use by others for recreational
> purposes,[8] or to give any warning of a dangerous condition,

---

[6]  There are two exceptions to the Act's immunity:  Nothing in this act limits in any way any liability which otherwise exists:  (1) For wilful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity; (2) For injury suffered in any case where the owner of land charges the person or persons who enter or go on the land for the recreational use thereof, except that in the case of land leased to the State or a subdivision thereof, any consideration received by the owner for such lease shall not be deemed a charge within the meaning of this section.  68 P.S. § 477-6.  Mrs. Grantham does not allege that either exception applies here.

[7]  The Act defines land as "land, roads, water, watercourses, private ways and buildings, structures and machinery or equipment when attached to realty."  68 P.S. § 477-2 (1).

[8]  The Act provides that recreational purposes include, but are not limited to, any of the

(continued...)

use, structure, or activity on such premises to persons entering
for such purposes.

68 P.S. § 477-3 (footnotes added).  This general immunity is further defined in § 477-4:

Except as specifically recognized by or provided in Section 6
of this Act, an owner of land who either directly or indirectly
invites or permits without charge any person to use such
property for recreational purposes does not thereby:

(1)     Extend any assurance that the premises are safe for any
purpose;

(2)     Confer upon such person the legal status of an invitee
or licensee to whom a duty of care is owed;

(3)     Assume responsibility for or incur liability for any
injury to persons or property caused by an act or
omission of such persons.

68 P.S. § 477-4.

The Supreme Court of Pennsylvania described the purpose of the Act as follows:

The legislative purpose of the [Act] is "to encourage owners
of land to make land and water areas available to the public
for recreational purposes by limiting their liability toward
persons entering thereon for such purposes." 68 P.S. § 477-1.
In order to encourage owners of land and water areas to make
these areas available to the general public for recreation, the
[Act] provides the owners with immunity from negligence
liability so long as the land and water area is provided to the
public for recreational purposes free of charge and any
injuries occurring on the land or water are not the result of a
"wilful or malicious failure to guard or warn against a

---

[8](...continued)
following, or any combination thereof:  hunting, fishing, swimming, boating, camping,
picnicking, hiking, pleasure driving, nature study, water skiing, water sports, cave exploration
and viewing or enjoying historical, archaeological, scenic, or scientific sites.  68 P.S. § 477-2 (3).

21

> dangerous condition, use or activity." 68 P.S. §§ 477-4, 477-6.
> "The need to limit owner liability derives from the
> impracticality of keeping large tracts of largely undeveloped
> land safe for public use." Rivera v. Philadelphia Theological
> Seminary, 510 Pa. 1, 15 n.17, 507 A.2d 1, 8 n.17 (1986).

Stone v. York Haven Power Co., 749 A.2d 452, 455 (2000) (footnote omitted).

Cases involving the Act have often turned on whether the tract of land on which an

accident occurred was large and unimproved.  Murtha, 875 A.2d at 1158.  Courts have

held that the Act's immunity applies to open land that remains in a mostly natural state,

whether the property is located in rural, suburban or urban areas.  Id. (citing Lory v. City

of Philadelphia, 674 A.2d 673 (1996) (holding the Act's immunity applied to natural pond

inside city park);  Friedman v. Grand Central Sanitation, Inc., 571 A.2d 373 (1990)

(holding the Act's immunity applied to defendant's landfill property);  Yanno v.

Consolidated Rail Corporation, 744 A.2d 279 (Pa. Super. Ct. 1999)(holding railroad

trestle located inside a 9.6 mile swath of unimproved land did not remove property from

the Act's protection));  see also Stone, 749 A.2d at 457 (holding that the Act's immunity

applied where a lake was open to the public for boating free of charge; "but for the Act,

the benefit these areas provide to the public might very well be lost, thereby denying to

the citizens a significant portion of the natural resources of Pennsylvania").

By contrast, Pennsylvania's courts have declined to apply the Act's immunity to

public recreational areas that are highly developed.  Murtha, 875 A.2d at 1158 (citing

Mills v. Commonwealth, 633 A.2d 1115, 1117 (1993) (holding the Act's immunity did

not apply where the waterfront area was "highly developed," urban, and no longer in its "natural state"); Walsh v. City of Philadelphia, 585 A.2d 445 (1991) (holding the Act's protection did not apply to city playground basketball court); Rivera, supra (the Act's protection did not apply to defendant's indoor swimming pool); DiMino v. Borough of Pottstown, 598 A.2d 357 (Pa. Commw. 1991) (the Act's protection did not apply to fenced-in borough playground)).

The Supreme Court of Pennsylvania has stated that "where land devoted to recreational purposes has been improved in such manner as to require regular maintenance in order for it to be used and enjoyed safely, the owner has a duty to maintain the improvements." Murtha, 875 A.2d at 1158 (citing Stone, 749 A.2d at 455). Though the statute's language is quite broad, the Act's protection should not extend beyond its legislative intent and thus "thwart basic principles of tort liability." Murtha, 875 A.2d at 1158 (citing Mills, 633 A.2d at 1118-19). "The purpose of the Act was to provide immunity to landowners as an incentive to them in exchange for their tolerance of public access to their recreational lands for recreational pursuits." Id.

Applying the holdings of these cases, I am convinced that the government is not immune from liability under the Act in this case. In Yanno, the Superior Court of Pennsylvania stated that it is proper for a trial court to consider the following factors when deciding whether a landowner receives immunity under the Act: (1) use; (2) size; (3) location; (4) openness; and (5) improvement. The court explained:

23

First, where the owner of the property has opened the property exclusively for recreational use, the property is more likely to receive protection under the [Act] than if the owner continues to use the property for business purposes.  Second, the larger the property, the less likely that it allows for reasonable maintenance by the owner and the more likely that the property receives protection under the [Act].  Third, the more remote and rural the property, the more likely that it will receive protection under the [Act] because the property is more difficult and expensive for the owner to monitor and maintain and because it is less likely for a recreational user to reasonably expect the property to be monitored and maintained.  Fourth, property that is open is more likely to receive protection than property that is enclosed.  Finally, the more highly developed the property, the less likely it is to receive protection because a user may more reasonably expect that the landowner of a developed property monitors and maintains it.

Yanno, 744 A.2d at 282-283.

Consideration of these Yanno factors tips the scale against granting the government immunity under the Act.  I agree with the government that the Park cannot be compared to the indoor swimming pool in Rivera, the large recreation center built by the city in Walsh, or Penn's Landing in Mills.  I do not agree with the government, however, that the Park more closely resembles the railroad trestle found inside a 9.6 mile swath of unimproved land in Yanno, or the lake created by the defendant's dam and open to the public for boating in Stone.  NPS's own website indicates that the Park spans over fifty-five acres on twenty city blocks within the historic district of the City of Philadelphia, and preserves and interprets many of our country's most important resources associated with the establishment of the United States of America.  See http://www.nps.gov/inde.  Tours

24

of the various points of interest at the Park are highly structured and timed.  The tourist is

far from free to drop by a particular site at his leisure and stay for an indefinite period.

Free timed tickets to Independence Hall are available at the Independence Visitor Center

on the day a tourist visits, or tickets may be reserved in advance for a fee of $1.50 per

ticket online or by telephone.  Id.  Contrary to the government's assertion that the site is a

sizeable, open, outdoor tract of land, the location where Mrs. Grantham fell does not

constitute a large track of unimproved land, lying in wait for a fun-seeking passerby to

visit.  The area surrounding Independence Hall is a highly developed section of the City

of Philadelphia and cannot be considered remote or rural.  A tourist would reasonably

expect that the Park's landowner would monitor and maintain it.  Accordingly, I find that

under these circumstances the government is not shielded from liability under the Act.  I

will deny the government's motion for summary judgment.

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LINDA GRANTHAM, et al., | : | CIVIL ACTION |
| **Plaintiffs** | : | |
| | : | |
| v. | : | NO. 06-5056 |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| et al., | : | |
| **Defendants** | : | |

**O R D E R**

STENGEL, J.

**AND NOW,** this   28th   day of August, 2008, upon careful consideration of the government's motion for summary judgment (Document #28), the plaintiffs' response thereto (Document #29), and the government's reply filed without leave of court (Document #30), IT IS HEREBY ORDERED that the motion is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that:

1.   Summary Judgment is GRANTED in favor of the government on Count III of the complaint;

2.   Summary Judgment is DENIED on all remaining claims.

BY THE COURT:

   /s/ Lawrence F. Stengel

LAWRENCE F. STENGEL, J.